ANDREW GRAY *et al.*

*v.*

LORENA LAMB *et al.*

*Opinion filed February 17, 1904.*

</div>

1. LIMITATIONS—*possession must be exclusive to be notice of rights under unrecorded deed.* Possession must be open, visible, exclusive, and of such a character that it will not be likely to be misunderstood, in order to operate as notice of the possessor's rights under an unrecorded deed.

2. REAL PROPERTY—*widow's latent equities waived by joining in deed by owner of record title.* Latent equities of a widow under an unrecorded deed to her first husband are waived where she joins in a deed by her second husband, who holds an apparently perfect record title to the property, running back to the government.

APPEAL from the Circuit Court of Kendall county; the Hon. GEORGE W. BROWN, Judge, presiding.

SEARS & SMITH, for appellants.

A. C. LITTLE, for appellees.

Mr. JUSTICE RICKS delivered the opinion of the court:

The bill in this case was filed by Lorena Lamb and Ruth Strausman, daughters, Isaac Bartlett, son, and Perly and Wallace Bartlett, children of John Bartlett, a deceased son, claiming as heirs of Aaron Bartlett, de-

ceased, in the circuit court of Kendall county, Illinois, on or about the 17th day of July, 1900, to set aside a warranty deed purporting to have been made, executed and delivered by Sylvanus Bartlett to one Andrew Gray, to lots 5 and 8, in block 14, in the original village of Oswego, Kendall county, Illinois, and dated on or about October 28, 1895, and also to compel Gray to account for the rents and profits for the use of said lot 8, of which Gray, by his tenant and son-in-law, Hildebrandt, has been in possession since about April, 1897.

The record shows that about 1840 Aaron Bartlett, with his family, settled in Oswego, Kendall county, Illinois, on the premises in controversy in this suit, and in 1842 obtained, but never recorded, a warranty deed for said lots 5 and 8 in controversy here. He immediately proceeded to build a house on lot 5, into which he moved with his family, where he resided until his death, in 1843. On lot 8 he built a blacksmith shop. He died intestate and his estate was never probated. After his death his wife, Phebe, and children, continued to occupy said premises until April, 1845, when she married Sylvanus L. Bartlett, a bachelor brother of the deceased, Aaron Bartlett, who came to Oswego a year or so after said deceased. After the marriage of Sylvanus and Phebe they continued for some time to reside on the premises in question. In 1847 Sylvanus obtained a warranty deed from Lewis B. Judson and wife, original grantors in the deed to Aaron, to said lots 5 and 8, and also a strip of land twelve feet wide off the south-west side of lot 4, in the same block. This deed was filed for record February 1, 1854, and duly recorded. In 1855 Sylvanus Bartlett and wife conveyed said lots 5 and 8, by warranty deed, to Jane C. Gibbs, having traded said lots for a sixty-acre farm, to which they moved and where they resided until 1859. The property thus conveyed to Gibbs and in question in this proceeding was thereafter conveyed several times by warranty deeds, until, in 1859, Sylvanus Bart-

lett re-purchased lots 5 and 8 from Abraham B. Staut,· who, his wife joining therein, executed and delivered to· Sylvanus a warranty deed for the premises conveyed. On January 12, 1859, Sylvanus had conveyed to him, by warranty deed from Paul G. Hawley and wife, a strip twelve feet wide off the south-west side of lot 4, in block 14, in Oswego, and also the alley between lots 4 and 5, in said block, which deed was duly filed and recorded. The record title to this property remained in Sylvanus Bartlett until March, 1895, when he and his wife, in consideration of future support, conveyed the same, by warranty deed, to William H. Marion, a grandson, but shortly thereafter said Marion concluded that he did not wish to assume such responsibility, and in April, 1895, by warranty deed, he re-conveyed said property to Sylvanus Bartlett. In July, 1895, Phebe, wife of Sylvanus, died, after which the old man, Sylvanus, continued to hold the record title to and resided on said property until October, 1895, when, in consideration of future support for the balance of his life and christian burial at his decease, he conveyed said property, by warranty deed, including lots 5 and 8, the twelve-foot strip and said alley, to Andrew Gray, the principal defendant herein, and nephew, by marriage, to Sylvanus.

Andrew Gray defends this suit on the theory that he is an innocent purchaser for value and claims a perfect record title; that if complainants ever had any rights herein they have lost them by the seven and twenty year statutes of limitation, and claims that complainants are guilty of *laches*. The position of complainants is, that Aaron Bartlett had a paper title to lots 5 and 8 when he died; that on his death his children became the owners thereof, subject to the homestead and dower rights of the widow; that her possession, as the wife of Sylvanus, until 1895, with Sylvanus, prevented the Statute of Limitations from running until her death, in 1895, and that within seven years thereafter this suit was insti-

tuted, and that therefore the sole possession of Sylva-
nus, after the death of his wife, has not precluded the
assertion of title by the heirs of Aaron Bartlett, the com-
plainants in this suit.

The case was referred to the master to take the evi-
dence and report his conclusions. The master found that
Aaron Bartlett had title, at the date of his death, to lots
5 and 8; that the widow of Aaron continued to reside on
the property until her death, she having married Syl-
vanus, a brother of Aaron; that after her death, in 1895,
the title became absolute in complainants. To the find-
ings of the master Andrew Gray filed objections, which
were overruled, and by agreement said objections stood
as exceptions before the trial court. The court affirmed
the master's report, with the exception of the allowance
to Andrew Gray of one item of expense disallowed by
the master, and entered a decree fixing the title to said
lots 5 and 8 in the complainants and setting aside the
deed to Gray.

Upon a review of the record in this case we are of the
opinion that the findings and conclusion of the master
and the decree of the trial court are erroneous and that
said decree should be reversed. Andrew Gray assumes
the position of an innocent purchaser for value of prem-
ises in the possession of his grantor, and who held a
straight record title, with no apparent imperfections.
From the evidence we are able to glean nothing that
substantially controverts this position. The record title
of Sylvanus Bartlett was absolutely clear, running back
to the government without a break. The occupancy of
these lands by Phebe, the widow of Aaron, after her mar-
riage with Sylvanus, was no such possession as would
require other persons to take notice of rights that may
have inured to her as the widow of Aaron Bartlett and
through the unrecorded deed. "Possession, before it can
be held to operate as notice of an unrecorded deed, must
be 'open, visible, exclusive and unambiguous, such as is

not liable to be misunderstood or misconstrued.' * * *
Such a possession must be of an open and visible charac-
ter, which will be calculated to apprise the world that
the property has been appropriated and is occupied,
and the occupancy must be exclusive. 'If only used
and enjoyed in common with others, or with the public
in general, it could not be regarded as hostile to others
claiming title.'" (*Robertson* v. *Wheeler*, 162 Ill. 566.)   The
wife of Sylvanus Bartlett, whatever may have been her
equitable rights under the unrecorded deed to her former
husband, by joining, as wife, in the warranty deed exe-
cuted to Jane C. Gibbs, in 1855, by Sylvanus Bartlett,
who held a clear record title, gave notice to the world
that she possessed no latent equities in the premises
conveyed.

The evidence shows conclusively that Sylvanus Bart-
lett, in 1859, under the warranty deeds from Abraham B.
Staut and Paul G. Hawley, went into possession of the
lands conveyed in the deed to Gray; that until the exe-
cution of the deed to Gray, Sylvanus treated said lands,
so far as the world could discern, as his own. Complain-
ants, however, contend that they, or some of them, paid
the taxes on said premises for a considerable portion of
this time, and that for the last fifteen years of the time
that Sylvanus held the record title to this property, Wil-
liam H. Marion, grandson of Sylvanus, paid the taxes.
There is nothing, however, to show that the complain-
ants, in furnishing such money as they did to pay the
taxes, did so to protect any rights possessed by them,
but the evidence does indicate that such contributions
were donations to their step-father, as a good deal of the
time, at least, the money was paid to Sylvanus and he
paid the taxes himself. As to Marion, he did not have,
or claim to have, any interest whatever in the land.

Andrew Gray swore that he had no knowledge of the
old unrecorded deed to Aaron Bartlett, nor of complain-
ants' alleged rights under it. The complainants them-

selves testified that they never said anything to Gray or to Sylvanus about said deed or their claims under it. Sylvanus testified that he never saw the old deed from 1842 until 1900, when it was produced in the trial of a forcible detainer suit brought by Gray against Sylvanus and Morris B. Lamb, husband of Lorena Lamb, one of the complainants in this suit, who were at that time living on a portion of this property. Sylvanus testified that he used the property as his own for nearly forty years, and that he thought it was his. The evidence shows that several, if not all, of the complainants, within a month thereafter knew of the contract between Sylvanus and Gray, and that Gray had been deeded this property under the agreement to take care of Sylvanus during the balance of his life and give him christian burial at his decease, and knew that Gray was furnishing provisions under this contract, yet they never hinted to him anything of their claims to the property in dispute until the filing of their bill, nearly five years thereafter, and they permitted Gray to go ahead and defray the funeral expenses at Sylvanus' decease. William Marion, to whom this property was deeded in 1895 for the same purpose that it was conveyed to Gray afterwards, testified that he supposed Sylvanus owned the property; that he took a warranty deed therefor from Sylvanus, but tiring of his responsibility under the agreement he re-conveyed the property to Sylvanus. He was a grandson, and was certainly in as good a position to know the rights of his relatives in the premises in dispute as would the defendant Gray. Gray testified that Sylvanus was begging for the necessaries of life and applied to him for assistance, and against his inclinations forced on him the deed and contract in question for the purpose of securing the necessaries of life and decent burial at his death. It does not appear from the evidence that the expectation of life of Sylvanus and the value of the property at the time the deed was made to Gray were such as to

render the bargain entered into by Gray a one-sided or unconscionable one.

We think the evidence in this case conclusively shows that the defendant Gray was an innocent purchaser for value, and what was said in *McNab* v. *Young,* 81 Ill. 11, is applicable to the facts disclosed in the record in this case (p. 15): "For aught appearing, the purchase by Clayton was in good faith, and those made of him by his co-defendants were also in good faith and with no notice of any infirmity in the title offered to be sold. How could purchasers know from the record there was fraud in the transaction or invalidity in deeds? They all appeared fair on the record, and there was nothing *dehors* the record to admonish those desirous of purchasing, of any danger or doubt. Appellant knew for four years the legal title had passed to Parsons but made no effort to divest him. He must have known of Parsons' sale to Clayton and of Clayton's various sales, as he was frequently in Chicago, but he made no objection. He did not interfere until the property had passed into various hands and become very valuable."

With the undisputed evidence showing that in 1855 Sylvanus Bartlett was joined by his wife, Phebe, in a conveyance to Jane C. Gibbs of the property in question, and moved away from said premises on to a farm owned by Sylvanus, where they remained four years, during which time the property in question was conveyed several times until the title finally rested in one Staut, who conveyed the same back to Sylvanus Bartlett, in 1859, for the consideration of $1200, we are unable to see how the master or chancellor reached the conclusion, as a matter of fact, that Phebe Bartlett held possession of the premises in controversy from the death of her first husband, Aaron, to the time of her death, as the foundation of the claim of the appellees. Moreover, the record shows that when Aaron Bartlett died he left five children: Sarah, who was then about twelve years of age,

and who died somewhere near the age of twenty; Ruth, one of appellees, now aged sixty; Lorena, another of appellees, aged sixty-one; Isaac, another of appellees, aged sixty-six; and John, who died about the year 1899, aged sixty-eight, who was the father of appellees Wallace and Perly Bartlett, and the record shows that the ages of the latter two grandchildren are above twenty-four years. There is no pretense that any of the children or grandchildren had any continuous residence on this property since about the close of the war, and then, about that time, the daughter Lorena and the son John occupied a little house, aside from the home house, on one of the lots, but surrendered the same when requested by Sylvanus, that the same might be used by him for a shop; so that there is no evidence of such possession by any one as could be said to have saved or preserved the rights of appellees in this property, or as having a tendency to give notice to or put upon inquiry Andrew Gray, the purchaser, of any equities they had or might have had by reason of the unrecorded deed mentioned in the bill. And the evidence very clearly shows that although the children of Aaron had knowledge of the existence of the old unrecorded deed, it also shows that they made no claim or had any idea that they had any rights under or by virtue of this deed until shortly before the bringing of the suit in question. We regard the evidence in this case as wholly inadequate to sustain the decree rendered herein. To hold otherwise would be to render nugatory the recording laws of this State and titles to lands unstable.

It is not necessary for us to discuss other contentions made in this case, as, for the reasons stated, the decree will be reversed and the case remanded to the circuit court of Kendall county, Illinois, with directions to dismiss complainants' bill.

*Reversed and remanded, with directions.*